**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 24-2588
_____

JASON JORJANI,
          Appellant

v.

NEW JERSEY INSTITUTE OF TECHNOLOGY;
JOEL S. BLOOM;
KEVIN J. BELFIELD;
FADI P. DEEK;
HOLLY STERN;
CHRISTINE LI
_____

On Appeal from the United States District Court for the
District of New Jersey
(D.C. Civil Nos. 2:18-cv-11693 and 2:20-cv-01422)
District Judge: Honorable William J. Martini
_____

Argued July 9, 2025

Before: KRAUSE, MATEY, and PHIPPS, *Circuit Judges*

(Filed: September 8, 2025)
_____

Frederick C. Kelly, III **[ARGUED]**
One Harriman Square
P.O. Box 60
Goshen, NY 10924
    *Counsel for Appellant*

Connor E. Bradley
Marc D. Haefner **[ARGUED]**
Tricia B. O'Reilly
Eric S. Padilla
Walsh Pizzi O'Reilly & Falanga
100 Mulberry Street
Three Gateway Center, 15th Floor
Newark, NJ 07102
    *Counsel for Appellee*

_____

OPINION OF THE COURT
_____

MATEY, *Circuit Judge*.

    New Jersey Institute of Technology declined to renew a lecturer's contract based on his private comments about race, politics, and immigration. But NJIT's regulation of speech outside the classroom and off the campus is subject to the restraints of the First Amendment, and the school documented no disruption to its educational mission. So we will reverse the District Court's judgment.

**I.**

NJIT hired Jason Jorjani in 2015 to teach philosophy, and twice renewed his contract in 2016 and 2017. During this time, Jorjani "formed the Alt Right Corporation," to "widen the message of his philosophy, which he describes as an affirmation of the Indo-European Tradition" and "the idea that European cultures are intimately related to those of Greater Iran and the Persianate World, Hindu India and the Buddhist East and are the sources the [sic] world's greatest scientific, artistic and spiritual developments." App. 106. He spoke at conferences and published an essay titled "Against Perennial Philosophy" on "AltRight.com," a website he helped found. In the essay, he argued that "human racial equality" is a "left-wing myth" and that a great "Promethean" "mentality" rests on a "genetic basis" which "Asians, Arabs, Africans, and other non-Aryan peoples" lack. App. 662, 668. The essay also argued that, through "genetic engineering" and eugenic "embryo selection," Iran could produce great philosophers by "restor[ing] the pre-Arab and pre-Mongol genetic character of the majority of the Iranian population within only one or two generations." App. 669. Jorjani did not discuss these outside associations with his students or colleagues, nor did he disclose them as required by NJIT policy.

Then, in 2017, a person posing as a graduate student contacted Jorjani to discuss "how the Left persecutes and silences Right wing thought in academia." App. 104–05. But he was working with a group called "Hope Not Hate," whose goal is to "deconstruct[]" individuals it deems "fascist" or "extremist." App. 104. The two met at a pub where the undercover operative recorded their conversations, at first with

3

Jorjani's consent. But later, apparently assuming the recording had stopped, Jorjani commented on matters concerning race, immigration, and politics. The meeting became a piece published by the New York Times featuring a video excerpt from Jorjani's remarks at a conference characterizing "liberalism, democracy, and universal human rights" as "ill-conceived and bankrupt sociopolitical ideologies,"[1] before cutting to the secretly recorded portion of Jorjani's conversation where he predicts "[w]e will have a Europe, in 2050, where the banknotes have Adolf Hitler, Napoleon Bonaparte, Alexander the Great. And Hitler will be seen like that: like Napoleon, like Alexander, not like some weird monster, who is unique in his own category." App. 407–08.

The day after the Times piece was published, NJIT's President emailed all faculty and staff, denouncing Jorjani's statements as "antithetical" to NJIT's "core values." App. 412.[2] NJIT's Dean of the College of Science and Liberal Arts sent a separate email echoing those sentiments. In the following days, NJIT received some unverified number of calls and, at most, fifty emails expressing concern about Jorjani's recorded

---

[1] Jesse Singal, Opinion, Undercover With the Alt-Right, N.Y. Times (Sept. 19, 2017), https://perma.cc/52T9-KGTM.

[2] Following the New York Times' article, Hope Not Hate "launched a campaign" gathering signatures to support its petition "calling on the NJIT to fire their fascist employee." App. 411. NJIT learned about the "Facebook campaign" from a professor at Yale, who encouraged NJIT to "get out . . . ahead" of the petition. App. 411. NJIT's President authorized a response to the Yale professor, denouncing Jorjani's views as "repugnant" and noting that NJIT was "acting on the matter." App. 730.

comments and his membership on the faculty. Faculty chimed in too, highlighting the content of Jorjani's "Against Perennial Philosophy" essay.

Six days after the New York Times posted the article, NJIT sent a letter to Jorjani placing him on paid leave, explaining the article 1) "caused significant disruption at the university" that NJIT believed would "continue to expand," and 2) revealed "association with organizations" that Jorjani did not disclose on his outside activity form, despite prior direction to fully update the form the preceding Spring. App. 542. The letter advised Jorjani that NJIT planned to investigate whether he had violated university policies or State ethics requirements.

Fallout continued with NJIT's Department of Biology penning a statement published in the student newspaper asserting "Jorjani's beliefs, as revealed by his remarks, cannot help but produce a discriminatory and intimidating educational environment for [NJIT's] diverse student body." App. 708. The Faculty Senate followed suit, releasing an "Official Faculty Senate Statement," explaining that "NJIT is a university that embraces diversity and sees that diversity as a source of strength. The NJIT Faculty Senate finds racist pronouncements made by University Lecturer Jason Reza Jorjani to be morally repugnant. Hate and bigotry have no place on the NJIT campus." App. 710–11. The Department of History also joined the fray, demanding Jorjani's termination and asserting his "published beliefs create a hostile learning environment for students of color in particular." App. 714.

As this occurred, NJIT retained a law firm to investigate whether Jorjani had disclosed his outside activities, or engaged

5

in practices "that resulted in a conflict of interest with his responsibilities toward NJIT." App. 117. The firm's report concluded he did, finding Jorjani: 1) "violated the New Jersey ethics code by failing to disclose that he was a founder, director, and shareholder of the AltRight Corporation"; 2) "violated NJIT faculty policy by cancelling 13 classes in the Spring of 2017," some of which "were not due to illness as he suggested" and resulted in negative student evaluations; 3) erroneously claimed the "video excerpts in the NYT Op-Ed were misleadingly edited to paint [him] in a false light"; and 4) "exhibited a clear pattern of non-responsiveness from the time he started working at NJIT" by neglecting his email inbox. App. 49. NJIT then elected not to renew Jorjani's contract.

Jorjani sued NJIT, alleging retaliation in violation of the First Amendment. During discovery, Jorjani argued that by disclosing an unprivileged factual report and including its General Counsel in discussions about his contract, NJIT waived its attorney-client privilege over all communications and work product related to his non-renewal. Finding no waiver, the District Court affirmed the Magistrate Judge's ruling denying Jorjani's request for privileged communications.[3]

---

[3] We see no error. The investigative report was not itself privileged, given it stemmed from a factual investigation and contained no legal advice. *See In re Chevron Corp.*, 650 F.3d 276, 289 (3d Cir. 2011). And counsel's participation in discussions concerning Jorjani's contract did not result in an "attempt[] to prove [a] claim or defense by disclosing or describing an attorney client communication." *Rhone-Poulenc Rorer Inc. v. Home Indem. Co.*, 32 F.3d 851, 863 (3d Cir.

The District Court later granted NJIT's motion for summary judgment, concluding that Jorjani's speech was not protected by the First Amendment because "Defendants' interest in mitigating the disruption caused by Plaintiff's speech . . . outweighs Plaintiff's interest in its expression." App. 63.[4] Seeing error in that conclusion, we will vacate and remand.[5]

---

1994). So the District Court did not abuse its discretion in concluding NJIT did not waive the attorney-client privilege by disclosing the report.

[4] The District Court did not go further to consider whether the speech was a substantial or motivating factor in the alleged retaliation, the same action would have occurred absent Jorjani's speech, or NJIT officials were entitled to qualified immunity. We leave those matters for remand.

[5] The District Court had jurisdiction under 28 U.S.C. § 1331 and we have jurisdiction under 28 U.S.C. § 1291. We review the District Court's grant of summary judgment de novo, affirming if, after drawing all reasonable inferences for the nonmoving party, "there is no genuine dispute as to any material fact," and the moving party "is entitled to judgment as a matter of law." *Shuker v. Smith & Nephew, PLC*, 885 F.3d 760, 770 (3d Cir. 2018) (quoting Fed. R. Civ. P. 56(a)). And we review the District Court's evidentiary rulings, including waiver of attorney-client privilege, for abuse of discretion. *See Kyriakopoulos v. Maigetter*, 121 F.4th 1017, 1020 (3d Cir. 2024).

## II.

The restraints of the First Amendment on public employment actions arise from caselaw. As we have explained, "[t]o state a First Amendment retaliation claim, a public employee plaintiff must allege that his activity is protected by the First Amendment, and that the protected activity was a substantial factor in the alleged retaliatory action." *Gorum v. Sessoms*, 561 F.3d 179, 184 (3d Cir. 2009). If those two requirements are satisfied, the burden shifts and the employer must show "the same action would have been taken even if the speech had not occurred." *Dougherty v. Sch. Dist. of Philadelphia*, 772 F.3d 979, 986 (3d Cir. 2014).

A public employee's speech is protected if 1) "the employee spoke as a citizen," 2) his "statement involved a matter of public concern," and 3) "the government employer did not have 'an adequate justification for treating the employee differently from any other member of the general public' as a result of the statement he made." *Gorum*, 561 F.3d at 185 (quoting *Hill v. Borough of Kutztown*, 455 F.3d 225, 241–42 (3d Cir. 2006)). In assessing the third prong, we "balance . . . the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Pickering v. Bd. of Ed.*, 391 U.S. 563, 568 (1968). So "the more substantially an employee's speech involves matters of public concern, the higher the state's burden will then be to justify taking action, and vice versa." *Fenico v. City of Philadelphia*, 70 F.4th 151, 162 (3d Cir. 2023); *see also Dougherty*, 772 F.3d at 991.

After balancing the parties' interests, the District Court concluded Jorjani's speech was not protected and did not conduct the rest of the *Pickering* analysis. Jorjani says 1) *Pickering* should not apply to extramural speech or speech lacking malice, and 2) even if it does, the disruption NJIT reported cannot outweigh the interest in his off-campus commentary. His first challenge is beyond our purview, but his second holds merit.

**A.**

Jorjani first seeks a new exception to *Pickering* for extramural speech or speech void of malice. But the Supreme Court has uniformly applied *Pickering* to public employee speech, even when made during an employee's spare time. *See, e.g.*, *Lane v. Franks*, 573 U.S. 228, 236–38 (2014); *City of San Diego v. Roe*, 543 U.S. 77, 80–81 (2004) (per curiam); *see also MacRae v. Mattos*, 145 S. Ct. 2617, 2617–20 (2025) (Thomas, J., respecting the denial of certiorari). We have followed a similar course, using *Pickering* to determine whether a law enforcement officer's personal social media posts were protected, including comments about broader societal topics like "race, religion, [and] ethnicity." *Fenico*, 70 F.4th at 154. All requiring that we use *Pickering* here.

Jorjani's contention that *Pickering* requires malice also misreads caselaw. *Pickering* explained that "absent proof of false statements knowingly or recklessly made by him, a teacher's exercise of his right to speak on issues of public importance may not furnish the basis for his dismissal from public employment." 391 U.S. at 574. But *Pickering* involved defamation, occasioning the Court's malice requirement. *Id.* When defamation is not at issue, neither is malice. *See, e.g.*,

*Connick v. Myers*, 461 U.S. 138, 142–54 (1983); *Gorum*, 561 F.3d at 184–87.

**B.**

NJIT's actions do not pass the ordinary *Pickering* analysis on this record. The parties agree that Jorjani spoke as a private citizen[6] on a matter of public concern.[7] So we consider only whether the distractions NJIT identified as

---

[6] We do not foreclose the possibility that the responsibilities of a public university professor or lecturer may encompass off-campus speeches and publications in his capacity as a public employee. Here, however, NJIT argues that Jorjani was speaking purely as a private citizen, so we need not address those questions.

[7] An agreement we join since speech relating "to any matter of political, social, or other concern to the community" is one that involves matters of public concern. *Connick v. Myers*, 461 U.S. 138, 146 (1983). Jorjani's speech easily falls within those bounds because it tackles matters of race, which although "carries the potential to be inflammatory," *Fenico v. City of Philadelphia*, 70 F.4th 151, 165 (3d Cir. 2023), is speech "inherently of public concern," *id.* (quoting *Connick*, 461 U.S. at 148 n.8); *see also Locurto v. Giuliani*, 447 F.3d 159, 183 (2d Cir. 2006) ("Whatever our own views of the quality and prudence of the plaintiffs' chosen means of expression, commentary on race is, beyond peradventure, within the core protections of the First Amendment."); *Snyder v. Phelps*, 562 U.S. 443, 454 (2011) (explaining even speech "fall[ing] short of refined social or political commentary," can still raise issues "of public import"). That conclusion aligns with NJIT's decision to immediately join the debate, notifying the entire faculty of Jorjani's remarks and denouncing them.

flowing from Jorjani's speech outweigh interest in his discussion. They do not.

**1.**

Begin with interest in Jorjani's speech, which cannot "be considered in a vacuum" as "the manner, time, and place of the employee's expression are relevant." *Rankin v. McPherson*, 483 U.S. 378, 388 (1987). Jorjani's speech occurred entirely outside NJIT's academic environs. His theories, even if lacking in classical rigor, remain of public import. It matters not that his opinions do not enjoy majoritarian support, since "the proudest boast of our free speech jurisprudence is that we protect the freedom to express 'the thought that we hate.'" *Matal v. Tam*, 582 U.S. 218, 246 (2017) (quoting *United States v. Schwimmer*, 279 U.S. 644, 655 (1929) (Holmes, J., dissenting)). All amply showing that interest in Jorjani's speeches, writings, and discussions carries some significance to balance.

**2.**

Against that interest, we weigh NJIT's need "as an employer" to promote "the efficiency of the public services it performs." *Pickering*, 391 U.S. at 568. NJIT points only to the "disruption" that followed the publication of Jorjani's remarks consisting of certain students' disapproval of Jorjani's speech, disagreement among faculty, and administrators fielding complaints. Response Br. 46–47. We "typically consider whether the speech impairs discipline or employee harmony, has a detrimental impact on close working relationships requiring personal loyalty and confidence, impedes the performance of the speaker's duties, or interferes with the

enterprise's regular operations." *Munroe v. Cent. Bucks Sch. Dist.*, 805 F.3d 454, 472 (3d Cir. 2015), *as amended* (Oct. 25, 2019). And we focus mostly on what happened, not what might have been, because although NJIT can act to prevent future harms, *see id.* at 480, and need not "allow events to unfold to the extent that the disruption of the office and the destruction of working relationships is manifest," *Connick*, 461 U.S. at 152, it must ground predictions in reason, not speculation, *see Waters v. Churchill*, 511 U.S. 661, 673 (1994) (plurality); *United States v. Nat'l Treasury Emps. Union*, 513 U.S. 454, 475 (1995). The minimal evidence of disruption that NJIT cites differs little from the ordinary operation of a public university and therefore cannot outweigh interest in Jorjani's speech.

First, there is no support for NJIT's contention that student disapproval of Jorjani's speech disrupted the administration of the university. Some students and alumni disagreed with Jorjani's views. But NJIT never identified the exact number of calls or complaints made in person or writing, nor any details about the students' concerns. And although Jorjani said that he perceived a "huge change in attitude toward [him] on the part of [his] students," Supp. App. 3, NJIT points to no objective evidence that students questioned Jorjani's ability to teach, grade, or supervise his classes evenly, beyond one administrator recalling a student dropped Jorjani's class. App. 283. Entirely absent is any evidence of specific student protests, upheaval, or unwillingness to abide by university policies. But "in the context of the college classroom," students have an "interest in hearing even contrarian views." *Meriwether v. Hartop*, 992 F.3d 492, 510 (6th Cir. 2021); *see also Blum v. Schlegel*, 18 F.3d 1005, 1012 (2d Cir. 1994) (explaining that "the efficient provision of services" by a university "actually depends, to a degree, on the dissemination

12

in public fora of controversial speech"). NJIT's theory that student dissent rose to the level of disruption is simply speculative.

Second, the cited disputes among Jorjani and his colleagues are not disruption. NJIT cites the pointed letters denouncing Jorjani published by faculty in the pages of the student newspaper, but that is precisely the sort of reasoned debate that distinguishes speech from distraction. And there is no allegation these editorials, or Jorjani's belief they were defamatory and warranted suit, interfered with the ability of other faculty to fulfill their responsibilities in research, teaching, or shared governance, or otherwise thwarted the university's efforts to educate its students. So although challenges to "employee harmony" might pose disruption when disagreements disturb "close working relationships," *Munroe*, 805 F.3d at 472, that concern is irrelevant inside the university where professors serve the needs of their students, not fellow academics.[8]

---

[8] *See Munroe*, 805 F.3d at 476 n.10 (noting a high school teacher's role did not require personal loyalty and confidence with school administrators); *Bauer v. Sampson*, 261 F.3d 775, 785 (9th Cir. 2001), *as amended* (Oct. 15, 2001) ("[G]iven the nature of academic life, especially at the college level, it was not necessary that Bauer and the administration enjoy a close working relationship requiring trust and respect—indeed anyone who has spent time on college campuses knows that the vigorous exchange of ideas and resulting tension between an administration and its faculty is as much a part of college life as homecoming and final exams.").

That leaves only NJIT's ordinary obligation to field calls and emails, routine administrative tasks that, conceivably, might become so overwhelming in number or nature as to disrupt. But not here. The record reveals that throughout this occurrence there were "[p]ossibly" fifty emails received about Jorjani. App. 388. Calls were so few that NJIT's witness was "not sure what the number is," and only knew "by reading some emails that so-and-so called the mother, and so-and-so called, former student called, things of that nature." App. 390. All a most minor uptick in communications, if at all, and one that required no additional staffing to support the single administrator who handled these inquiries.

While NJIT raises an "interest in providing a non-denigrating environment," and appeals to the notion that Jorjani's views could, theoretically, undermine the pedagogical relationship between a teacher and student, Response Br. 41, it has not pointed to anything in the record that indicates its determination was based on competence or qualifications.[9] In essence, NJIT posits that because Jorjani offered views it disliked, the First Amendment should not apply, and it is entitled to summary judgment. We cannot agree, lest we permit "universities to discipline professors, students, and staff any time their speech might cause offense." *Meriwether*, 992 F.3d at 510.

\* \* \*

---

[9] And this case does not implicate a university's "discretionary academic determinations" that entail the "review of [] intellectual work product" or "the qualifications of faculty members for promotion and tenure." *Kunda v. Muhlenberg Coll.*, 621 F.2d 532, 547–48 (3d Cir. 1980)

On balance, the disruption NJIT described does not outweigh even minimal interest in Jorjani's speech, so the District Court erred in concluding Jorjani's speech was not protected by the First Amendment. We will vacate the judgment and remand for further proceedings consistent with this opinion.